IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN E. GILMORE,<br><br>   Plaintiff,<br><br>   v.<br><br>WELLS FARGO BANK N.A., a national bank; NDEX WEST LLC, a Delaware limited liability company;<br><br>   Defendants.<br>_____/ | No. C 14-2389 CW<br><br>ORDER GRANTING PRELIMINARY INJUNCTION<br><br>(Docket Nos. 12, 17) |

   This is a mortgage foreclosure case in which Plaintiff Kevin E. Gilmore claims that Defendants Wells Fargo Bank, N.A. and NDEX West LLC have engaged in "dual tracking" in violation of California's Homeowner Bill of Rights (HBOR).  On June 5, 2014, the Court granted Gilmore's application for a temporary restraining order and ordered Defendants to show cause why a preliminary injunction should not issue.  Wells Fargo responded to the OSC and opposed the issuance of a preliminary injunction.  On June 18, 2014, the Court held a hearing.  On that day, the Court granted a preliminary injunction.  See Docket No. 23.  The Court explains its reasoning in this written order.

                              BACKGROUND

   Gilmore inherited from his grandfather the property at issue, located in Berkeley, California, and has lived there since he was a child.  Gilmore Decl. ¶¶ 2-4.  On June 21, 2007, he took out a

loan secured by a promissory note in the principal sum of $375,000 to World Savings Bank, FSB. Id. ¶ 2. Through a series of mergers, the servicing of his loan was transferred to Wachovia Bank and then to Wells Fargo. Id. ¶ 7. Wells Fargo asked Gilmore several times to provide proof of hazard insurance on the property, but because of the several transfers of his loan, Gilmore did not know where he should send proof. Id. ¶ 8. As a result, Gilmore's loan servicer automatically placed insurance on the property and required him to pay, even though Gilmore had his own coverage. See id. ¶ 9.

Due in part to the financial burdens of the wrongfully placed insurance, as well as his other financial obligations, in 2010 Gilmore became delinquent on his loan. Id. ¶ 10; see also Thomas Decl. ¶ 6. From 2011 to 2013, he submitted a number of applications seeking loan modifications. Gilmore Decl. ¶ 12; Thomas Decl. ¶ 6, Exs. A-I. Each one was denied, almost always due to insufficient documents. Id. On or about March 21, 2012, Wells Fargo recorded and served a Notice of Default. Gilmore Decl. ¶ 15. Around June 2013, Gilmore's loan modification was rejected because he had excessive financial obligations. Id. ¶ 16.

In early 2014, Gilmore experienced a material change in his financial circumstances -- his income increased and his financial obligations decreased by about $1,000 a month. Id. ¶ 17. On March 12, 2014, he attended a home preservation workshop where he

2

submitted a loan modification application to a particular Wells Fargo representative and was told his application was complete. See Gilmore Supp. Decl. ¶¶ 35-36. Gilmore asserts that he asked the Wells Fargo representative if he should add to the application his live-in girlfriend's contribution, but the representative advised against it, so Gilmore submitted the application based only on his own income of $5,400 a month. Id. ¶ 28. Wells Fargo acknowledges receipt of the loan modification application and provides a copy of what it received. See Thomas Decl. ¶ 9, Ex. M. Gilmore received a letter acknowledging receipt of the loan modification application. Gilmore Decl., Ex. A.

Wells Fargo later determined the application was incomplete and required three additional documents: (1) a valid profit and loss statement covering ninety days for Gilmore's business (the one submitted covered a period ending after the date of submission; (2) a profit and loss statement for Gilmore's live-in girlfriend, the non-borrower contributor; and (3) proof of occupancy and a paystub for the girlfriend. Thomas Decl. ¶ 9. Notably, the copy of Gilmore's application provided by Wells Fargo does not list Gilmore's live-in girlfriend as a co-borrower, nor does it list any of her information. See Thomas Decl., Ex. M. On March 25, 2014, Wells Fargo called Gilmore advising him that he was missing several documents, while at the same time notifying him of the active foreclosure. See id. ¶ 9, Ex. N (call log). After that, Wells Fargo representatives contacted Gilmore a few

3

more times advising him of the same, sometimes leaving him voice messages if they could not reach him. Id.  Gilmore did not provide the requested documents. Id. ¶ 10.  Wells Fargo alleges that, on May 28, 2014, it sent Gilmore a letter denying his application due to insufficient documents, but it did not provide the letter in its papers opposing this motion. Id. ¶ 11.[1]

Gilmore received a subsequent letter from Wells Fargo in response to his request for the status of his loan.  On April 21, 2014, Wells Fargo sent Gilmore a letter stating:

> As of the date of this letter, your mortgage loan is due for the December 15, 2010, through April 15, 2014 monthly installments. **Foreclosure is active and a foreclosure sale date is currently scheduled for May 19, 2014.  However, your mortgage loan is currently being reviewed for possible payment assistance**, and you will want to continue working with Sarah Nuncio during the review process.

Gilmore Decl., Ex. B (emphasis added).  Gilmore alleges he wishes to obtain a loan modification so he can complete loan payments but has not been given a fair chance to do so.  Gilmore Decl. ¶ 24.

## LEGAL STANDARD

To obtain a preliminary injunction under Federal Rule of Civil Procedure 65, the moving party must demonstrate "(1) a likelihood of success on the merits; (2) a significant threat of

---

[1] This letter has since been provided in conjunction with Wells Fargo's separate motion to dismiss the complaint. See Docket No. 30 (Request for Judicial Notice), Ex. 9.  Although the Court need not consider this document because it was presented after the present motion was already submitted, the letter appears to be a form letter responding to Gilmore's request for assistance and noting that the application has been closed due to insufficient documents.

4

irreparable injury; (3) that the balance of hardships favors the applicant; and (4) whether any public interest favors granting an injunction." Raich v. Ashcroft, 352 F.3d 1222, 1227 (9th Cir. 2003); see also Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 374 (2008). The Ninth Circuit has recognized that an injunction could issue if "serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor," so long as the plaintiff demonstrates irreparable harm and shows that the injunction is in the public interest. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation and internal quotation marks omitted). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22.

                                DISCUSSION

I.   Likelihood of success on the merits

     Gilmore alleges that Wells Fargo violated California's HBOR. The purpose of the act, which came into effect on January 1, 2013, is to ensure that borrowers "have a meaningful opportunity to obtain available loss mitigation options," including "loan modifications or other alternatives to foreclosure." Cal. Civ. Code § 2923.4. One of the HBOR's provisions prohibits mortgage servicers from engaging in what is known as "dual-tracking," or the practice of continuing to pursue foreclosure of a property while review of a loan modification application is still pending.

5

See Cal. Civ. Code § 2923.6(c).[2]  Accordingly, if the borrower submits a loan modification application, the mortgage servicer must first make a written determination that the borrower is not eligible for a loan modification before recording a notice of default or conducting a trustee's sale.  Id.  Denial of the loan modification triggers a thirty-day appeal period.  Cal. Civ. Code § 2923.6(d).  If a loan modification is offered, and the borrower either rejects the offer or accepts the offer but breaches the loan modification agreement, then the mortgage servicer may initiate foreclosure proceedings.  Id. subsection (c).

Wells Fargo disputes whether the HBOR provision applies to this case.  A settlement was reached in a case entitled, United States of America v. Bank of America Corp., Case No. 1:12-cv-00361 RMC, called the National Mortgage Settlement (NMS).  The terms of the NMS were memorialized in a Settlement Term Sheet, which imposes a number of requirements on NMS signatories.  The HBOR provides a safe harbor provision insulating an NMS signatory from liability so long as the signatory "is in compliance with the relevant terms of the Settlement Term Sheet of that consent

---

[2] The statute provides in relevant part: "If a borrower submits a complete application for a first lien loan modification offered by, or through, the borrower's mortgage servicer, a mortgage servicer . . . or authorized agent shall not record a notice of default or notice of sale, or conduct a trustee's sale, while the complete first lien loan modification application is pending."

6

judgment with respect to the borrower who brought an action pursuant to this section." Cal. Civ. Code § 2924.12(g).

Wells Fargo argues that its compliance can only be determined according to the report issued by the monitor appointed to administer the Consent Judgment in the District of Columbia case. The Consent Judgment itself is concerned with mortgage servicing, origination, and certification in general, rather than with respect to any particular mortgage. The monitor has found Wells Fargo to be in compliance. See RJN, Ex. 8. Wells Fargo argues that the California statute "creates an ambiguity and reveals a lack of understanding of the compliance and enforcement provisions of the NMS." Wells Fargo's Response to OSC, 7. To the extent that the California statute is interpreted to create a different standard of "compliance" that is not in the NMS, Wells Fargo argues that allowing California courts to interpret the NMS would invade the District of Columbia court's exclusive jurisdiction for interpreting its own Consent Judgment.

Wells Fargo's argument is unpersuasive. Section 2924.12(g) unequivocally and unambiguously states that the compliance required for immunity from California's HBOR statutory provisions is "with respect to the borrower who brought an action pursuant to this section." It is a cardinal principle of statutory construction "that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." Duncan v.

7

Walker, 533 U.S. 167, 174 (2001).  Wells Fargo's reading of the statute would render the phrase noted above to be superfluous.  The plain meaning of that phrase demonstrates that a defendant must comply with the terms with respect to the borrower in question, or else the borrower may sue under the HBOR.[3]  This does not invade the jurisdiction of the District of Columbia court to enforce its own consent decree, monitoring signatories according to its own provisions.  Conversely, the monitor in the District of Columbia court does not govern the administration of California law.  The California legislature chose to incorporate the NMS' Settlement Term Sheet into the safe harbor provision of the HBOR but did not delegate to the NMS monitor the determination of the state's safe harbor provision.

Wells Fargo has not shown that it has complied with the terms of the Settlement Term Sheet with respect to the servicing of the loan in question.[4]  Gilmore presents evidence showing that Wells Fargo failed to provide him with an online portal which, among

---

[3] Although the issue has not been discussed extensively, courts in this district have applied the safe harbor provision with respect to the borrower bringing the suit.  See, e.g., Penermon v. Wells Fargo Bank, N.A., __F.Supp.2d__, 2014 WL 2754596, at *7 (N.D. Cal.); Bowman v. Wells Fargo Home Mortgage, 2014 WL 1921829, at *4 (N.D. Cal.).

[4] Although Wells Fargo asserted at the hearing that Gilmore had the burden to prove the NMS did not apply, safe harbor under the HBOR is "an affirmative defense . . . for which Wells Fargo has the burden of proof."  Bowman, 2014 WL 1921829, at *4 (quoting Rijhwani v. Wells Fargo Home Mortgage, Inc., 2014 WL 890016, at *9 (N.D. Cal.)).

8

other things, would allow him to check the status of his loan modification application.  Gilmore Decl. ¶ 22; Pivtorak Decl., Ex. A (Settlement Term Sheet), A-25.  Wells Fargo does not dispute this allegation with any valid evidence.  At the hearing, Wells Fargo's counsel asserted there was an online portal, but did not say whether the portal satisfied the conditions of the Settlement Term Sheet or provide any admissible evidence to back up that claim.  June 18, 2014 Transcript, 6:18-7:22.  Attorney argument is not evidence.  Thus, it is likely that Wells Fargo has violated the provisions of the NMS with respect to Gilmore's mortgage and is not protected by the safe harbor provision of the HBOR.

Gilmore additionally demonstrates that it is likely that Wells Fargo has engaged in dual tracking in violation of the HBOR and the NMS, which would be an alternative ground for finding that the HBOR's safe harbor provision does not apply.  The NMS provides:

> If, after an eligible borrower has been referred to foreclosure, Servicer receives a complete loan modification application more than 30 days after the Post Referral to Foreclosure Solicitation letter, but more than 37 days before a foreclosure sale is scheduled, then while such loan modification application is pending, Servicer shall not proceed with the foreclosure sale.

Settlement Term Sheet, A-19 ¶ 6.  If the loan modification requested by the borrower is denied, and more than ninety days remain until a scheduled foreclosure date or a date when foreclosure could reasonably occur, then a borrower is entitled to an appeal process.  Id. at ¶ 7.  The servicer cannot foreclose

9

until the expiration of a thirty-day appeal period or, if the borrower appeals, the termination of the appeal process. Id. If the borrower completes a loan modification application between thirty-seven to fifteen days before a foreclosure sale is scheduled, then the servicer need only conduct an expedited review of the application. Id. at A-19-A-20 ¶ 8. Even if the borrower completes a loan modification application less than fifteen days before a foreclosure sale is scheduled, the servicer must nevertheless notify the borrower of its determination or inability to complete its review of the application. Id. at A-20 ¶ 9. Notice of a denial shall inform the borrower that he has thirty days to provide evidence that the decision was in error. Id. at A-27 ¶ 2.

California's HBOR prohibits the mortgage servicer or authorized agent from recording a notice of default, recording a notice of sale, or proceeding to foreclosure while review of a complete loan modification application is pending. Cal. Civ. Code § 2923.6(c).[5] If the borrower has previously been reviewed for a loan modification and has been denied, then the servicer is not required to evaluate a new application unless it includes a documented change of the borrower's financial circumstances. Id.

---

[5] The provision uses the term "first lien loan modification," which means a modification of the loan on "the most senior mortgage or deed of trust on the property," not the first submitted application for a loan modification. See Cal. Civ. Code § 2920.5(d) (defining the term "first lien" for purposes of the article).

subsection (g). The servicer must provide the borrower with written notice identifying the reasons for the denial and other applicable information, which triggers a thirty-day appeal process. Id. subsections (c)-(f).

Gilmore submits evidence that the loan modification application he completed at the home preservation workshop was based on his income information only. His application materials, which Wells Fargo submitted to the Court, corroborate his claim. It appears that no final rejection was ever provided to Gilmore, which would likely have triggered an appeal process. The April 21, 2014 letter that Wells Fargo sent Gilmore informed him that the foreclosure process was proceeding, but that review of his application was ongoing. Because the letter does not provide a clear denial of Gilmore's application with notice of his options going forward, this would appear to be a violation of the provisions of both the NMS and the HBOR.

Wells Fargo contends that Gilmore's loan modification application was never complete. While Wells Fargo alleges that Gilmore failed to submit certain documents, Gilmore points out that this deficiency was noted in error because the documents identified by Wells Fargo were either unnecessary for his application (the girlfriend's documents, which the Wells Fargo representative stated were unnecessary, and upon which Gilmore did not rely), or were not communicated clearly to Gilmore. Further, although Wells Fargo alleges it called Gilmore several times to

11

obtain the requested documents, Gilmore points out this was a departure from Wells Fargo's typical practice over the years, which was to send letters requesting additional documents. See, e.g., Gilmore Decl., Ex. A; Thomas Decl., Ex. I.  The result is that there are at least serious questions going to whether Gilmore completed his loan modification application.[6]

II.  Irreparable Harm, Balance of the Hardships, and Public Interest

As noted in the TRO, the other factors weigh heavily in favor of Gilmore.  The foreclosure sale currently scheduled would impose immediate and irreparable injury because Gilmore would lose real property, which is always considered unique. Sundance Land Corp. v. Cmty. First Fed. Sav. & Loan Ass'n, 840 F.2d 653, 661 (9th Cir. 1988).  Gilmore's loss would be particularly significant because the property at issue is his childhood home.  He would also be deprived of a meaningful opportunity to be considered for available loss mitigation options, which is his right under the HBOR.  This situation is exactly the sort of harm that the HBOR was intended to prevent -- borrowers unable to achieve a

---

[6] Indeed, under the statutory scheme requiring a detailed denial and appeal process, it might have been in Wells Fargo's interest to avoid providing a final rejection letter and instead allege that Gilmore's application was "incomplete."  As Gilmore's counsel notes, the fact that Gilmore has attempted to modify his loan numerous times without success could cut both ways.  It could reflect on the difficult nature of Wells Fargo's loan modification process and the fact that servicers are incentivized to allege that applications are incomplete in order to move forward with foreclosure.  See June 18, 2014 Transcript, 8:5-17.

12

meaningful and clear review of their loan modification applications.  See Penermon, 2014 WL 2754596, at *6.

On the other hand, the potential harm to Wells Fargo is unlikely to be substantial.  If it is revealed at the end of the litigation that injunctive relief was wrongly issued, Wells Fargo could then foreclose on the property and gain from the substantial value of the property.  In that case, a preliminary injunction would have only delayed foreclosure for a relatively short period of time.  The terms of an injunction also may be tailored to minimize any potential harm to Wells Fargo.  Because the irreparable injury to Gilmore is comparatively severe, the balance of hardships weighs in Gilmore's favor.

The last factor also weighs in favor of granting an injunction.  Due to the "adverse impact foreclosures have on households and communities," there is a "strong public interest in preventing unlawful foreclosures."  Sharma v. Provident Funding Associates, LP, 2010 WL 143473, at *2 (N.D. Cal.).  Loan modifications and other non-foreclosure alternatives can help borrowers avoid foreclosures.  See Penermon, 2014 WL 2754596, at *6.  As acknowledged by the California legislature in enacting the HBOR, there is a strong public interest in offering borrowers a meaningful opportunity to explore available loss mitigation options.  See id. ("This law was created to combat the foreclosure crisis and hold banks accountable for exacerbating it.").

13

In sum, because Gilmore has satisfied his burden of showing all the <u>Winter</u> factors are met, the Court preliminarily enjoins Wells Fargo from foreclosing on the property.

III. Bond amount

Wells Fargo contends that if a preliminary injunction were to issue, a bond of $65,000 should be required. Federal Rule of Civil Procedure 65(c) states that a court may issue a preliminary injunction only if the movant gives security in the amount the court considers proper to pay the costs and damages sustained if any party is found to be wrongly restrained or enjoined. However, a court nevertheless has the discretion to waive the bond requirement if there is a high probability of success that equity compels waiving the bond, the balance of the equities overwhelmingly favors the movant, it appears unlikely that the defendant will suffer any harm as a result of the preliminary injunction, or the requirement of a bond would negatively impact the movant's constitutional rights. <u>Baca v. Moreno Valley Unified Sch. Dist.</u>, 936 F. Supp. 719, 738 (C.D. Cal. 1996).

Wells Fargo alleges that Gilmore has not made a payment since 2010 and that he owes up to $415,100.14. Wells Fargo additionally asserts that, if it is prevented from foreclosing, it will lose interest payments due on the loan, taxes and insurance premiums paid on the property, and attorneys' fees. Gilmore responds that his property is worth at least $630,000, as determined by Wells Fargo in a valuation dated March 8, 2014. Pivtorak Supp. Decl.,

14

Ex. C.  Consequently, Wells Fargo should be protected fully by the value of the property.

In order to minimize the potential harm to Wells Fargo, the Court will require a bond for the preliminary injunction to stay in effect.  The bond shall take the form of monthly payments in the amount of Gilmore's last mortgage payment, or $1,800, which will be held in trust.  See June 18, 2014 Transcript, 2:11-3:11, 14:24-15:6.  As Gilmore will be paying the full amount of his mortgage every month to keep the preliminary injunction in place, a payment which Wells Fargo was not receiving at the time the suit was filed, Wells Fargo will not suffer undue harm.

## CONCLUSION

Defendant Wells Fargo, its agents, and all persons acting in concert or participating with Wells Fargo, are hereby restrained and enjoined from engaging in, committing, performing, or conducting, directly or indirectly, any and all of the following acts: commencing, continuing, maintaining, or conducting a trustee's sale or other foreclosure proceeding with regards to Plaintiff Kevin E. Gilmore's home located at 955 Virginia St., Berkeley, CA 94710, APN #058-2124-0193.

This preliminary injunction is conditioned upon Gilmore making monthly payments to Wells Fargo in the amount of $1,800, payable on the twenty-third day of every month, beginning Monday, June 23, 2014.  The payment must be sent to Wells Fargo's counsel in this case, who must place the payment in its firm's trust

15

account.  If Wells Fargo believes that Gilmore has breached this condition, then Wells Fargo must first ask the Court to lift the injunction before taking any action related to the property.

IT IS SO ORDERED.

Dated: 7/29/2014

_____
CLAUDIA WILKEN
United States District Judge